IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

TM COMPUTER CONSULTING, INC., an )
Oregon corporation, )
                              )
         Plaintiff, )   Civil No. 08-6267-HO
                              )
                              )
         v. )       ORDER
                              )
APOTHACARE, LLC, a Washington )
liability company, and MATTHEW REED, )
an individual, )
                              )
         Defendants. )
_____)

      Plaintiff, TM Computer Consulting, creates software products for the pharmaceutical industry through its "Apothacare" line of products and provides support services with respect to the software. Plaintiff created software called Pharmacist's Companion for its Apothacare line.

      Defendant Matthew Reed contends that plaintiff approached him with the idea of selling him the Apothacare portion of its business.

Reed started a new business; defendant Apothacare, LLC with the apparent belief that he would purchase the Apothacare portion of plaintiff's business. Instead, Apothacare, LLC became the exclusive value added retailer (VAR) for plaintiff. Plaintiff thus entered into a marketing licensing agreement allowing defendant Apothacare, LLC to use plaintiff's intellectual property (Pharmacist's Companion) to market the software, provide customer support and code enhancements.

The parties initially agreed on a one year period and added a six month extension. The agreement expired on June 30, 2008. The agreement provided that upon expiration:

> ...notwithstanding termination of this Agreement VAR shall retain the right to continue to support Authorized End-User Copies **that have been completed, marketed, and installed** pursuant to the VAR license **prior to the effective date of termination,** subject to continued payment of applicable royalties to the Owner.

Agreement at ¶ 12.4 (attached to Declaration of Bobbi Merritt (#6) as exhibit A) (emphasis added).

The parties dispute the meaning of this survival provision. Plaintiff asserts that defendants are marketing and supporting Pharmacist's Companion contrary to any rights they have under the contract. Plaintiff filed this action asserting unfair competition, trademark infringement, trade libel, and cybersquatting among other claims. Plaintiff seeks a preliminary injunction requiring defendants to:

1.    remove all references to TM Computer Consulting and Apothacare from defendants' website www.apothacarellc.com;

2.    remove the mortar and pestle design from defendants' website www.apothacarellc.com;

3.    remove all content from defendants' website www.apothacarellc.com;

4.    refrain from imitating, copying, using reproducing, registering, attempting to register and/or displaying the marks and designations APOTHACARE and the mortar and pestle design alone or in combination with any other term(s), word(s), name(s), logo(s), symbol(s), device(s), designation(s) and/or design(s) in any manner whatsoever;

5.    refrain from using any other false description or representation or any other thing calculated or likely to cause confusion, deception, or mistake in the marketplace with regard to the APOTHACARE mark and the mortar and pestle design;

6.    refrain from soliciting clients for software products and support services related to Pharmacist's Companion software other than clients designated in paragraph 12.4 of the Marketing License Agreement;

7.    refrain from defaming plaintiff, its employees, agents, officers, directors, attorneys, representatives, and products and services by email, website postings, phone conversations, and any other means of communication with existing and potential users of Pharmacist's Companion software;

8.    refrain from taking payments for goods and services from any customer relating to Pharmacist's Companion beyond those set forth in paragraph 12.4 of the Marketing License Agreement;

9.    retain copies of all past correspondence with any customer, potential customer, or former customer of products and services relating to Pharmacist's Companion, and turn over copies of such correspondence within 2 business days to counsel for plaintiff; and

10. refrain from responding to correspondence from any customer, potential customer, or former customer of products and services relating to Pharmacist's Companion during the pendency of any injunction and providing copies of incoming correspondence relating to Pharmacist's Companion to counsel for plaintiff within 2 business days of receipt of such correspondence.

Plaintiff also moves to enjoin defendants from

1. imitating, copying, using, reproducing, registering, attempting to register and/or displaying the marks and designations APOTHACARE, APOTHLINE, PHARMACIST'S COMPANION. and the mortar and pestle design or any mark of designation which colorably imitates or is confusingly similar to these marks and designations, including, without limitation, APOTHACARE, APOTHLINE, PHARMACIST'S COMPANION. and the mortar and pestle design alone or in combination with any other term(s), word(s), name(s), logo(s), symbol(s), device(s), designation(s) and/or design(s) in any manner whatsoever;

2. using any other false description or representation or any other thing calculated or likely to cause confusion, deception, or mistake in the marketplace with regard to the APOTHACARE, APOTHLINE, PHARMACIST'S COMPANION marks;

3. soliciting clients for software products and support services related to Pharmacist's Companion software;

4. operating any website using domain names intended to, or having the effect of, diverting traffic from plaintiff's web site http://www.apothacare.com, including but not limited to http://www.appothacarellc.com and http://apothacaresoftware.com;

5. using and/or disclosing plaintiff's confidential and proprietary information and trade secrets related to Pharmacist's Companion software;

6. doing any act or thing in breach of the confidentiality provisions of the Marketing License Agreement;

7. Accepting payments for goods and/or services relating to Pharmacist's Companion for customer's beyond those set forth in paragraph 12.4 of the Marketing License Agreement;

8.    communicating with customers, potential customers, and former customers concerning Pharmacist's Companion in regard to the Open Letter and related email; and

9.    completing transactions based on previous solicitations for goods and services relating to Pharmacist's Companion beyond those set forth in paragraph 12.4 of the Marketing License Agreement.


STANDARDS

In seeking a preliminary injunction, plaintiff must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor.  The critical element in determining the test to be applied is the relative hardship to the parties.  If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly.  Gilder v. PGA Tour, Inc., 936 F.2d 417, 422 (9th Cir. 1991).  For purposes of injunctive relief, serious questions refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo. Id.  Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.  Serious questions need not promise a certainty of

success, nor even present a probability of success, but must involve a fair chance of success on the merits. Id.

Even if the balance of hardships tips sharply in plaintiff's favor, however, it must be shown as an irreducible minimum that there is a fair chance of success on the merits. Stanley v. University of Southern California, 13 F.3d at 1313, 1319. (1994). Moreover, the public interest must be considered where the relief sought by the applicant might affect the public. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (where an injunction is requested which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff).[1]

DISCUSSION

Merits

As the agreement between plaintiff and Apothacare, LLC was about to expire, defendants registered two domain names with apothacare in the them (Apothacarellc.com and Apothacaresoftware.com). After the agreement expired defendants set up a near mirror image of plaintiff's website at defendant's domain www.apothacarellc.com.

---

[1] Defendants argue that irreparable harm is required for injunctive relief, but defendants cite cases involving permanent injunctions. See, e.g., Geertson Seed Farms v. Johanns, __ F.3d __, 2008 WL 4020108 (9th Cir. September 2, 2008).

6 - ORDER

After plaintiff filed this suit, defendant posted an open letter at its www.apothacarellc.com website stating as follows:

Dear Customer,

It is with great sadness that I must write this letter to you. As our customer you may unwittingly find yourself drawn into a conflict over Pharmacist's Companion. This will include confusion regarding where payments should be mailed and where you should call for support.  The short and simple answer, you are our customer, and we will support you; please feel free to contact us at 866-773-6049 or email us at the addresses contained herein.

To explain where things are at, let me begin with a little history.  Effective January 1, 2007, TM Computer Consulting of Terrebonne, Oregon, doing business as Apothacare, entered into a marketing and operations agreement with our company, Apothacare LLC of Everett, Washington.   Under this agreement, Apothacare LLC of Everett would take over sales, support, and billing operations related to Pharmacist's Companion.   You probably noticed that your primary support contacts transitioned to me, Matt Reed, or to Aaron Bale, the technical lead here at Apothacare LLC. It has been our pleasure to provide service for the last 19 months, and we plan to continue providing and improving service going forward.

Under the agreement TM Computer Consulting was to maintain the drug databases and the included comment libraries, and was to produce the next version of Pharmacist's Companion. With this in mind there was a verbal agreement that upon delivery, the full rights of Pharmacist's Companion would be sold to Apothacare LLC. Per the contract the new version of the software was to be delivered no later than December 31, 2007.  This did not happen.  The operations contract was extended until June 30, 2008, under the premise that Version 3 of the software would be delivered in working order by TM Computer Consulting.   Again this did not happen.   TM Computer Consulting then cancelled the operations contract. We are working hard to resolve our differences with TM Computer Consulting in a manner that will result in the minimum disruption of service and the minimum amount of confusion to you, our customers.

This brings us to today.  We have new support numbers, we can currently be reached at 866-773-6049 for support, and

we can reached on the web at www.apothacarellc.com . Also, our emails have changed to reflect the apothacarellc.com internet address.  Please feel free to contact us at the addresses appearing in this letter.

Currently under dispute is your status as our customer, but we believe you are our customer per the termination terms of our written agreement with TM Computer Consulting. TM Computer Consulting is claiming the right to provide services and support. Having consulted legal counsel on this matter, we at Apothacare LLC disagree with this contention held by TM Computer Consulting.

For the last 19 months, you have been serviced and billed by Apothacare LLC of Washington.  As such, we believe that you became our customer when your license first renewed with us, and we became your primary contact for the Pharmacist's Companion software. We believe you are our customer, we believe we owe it to you to continue supporting you the best way possible. Our dispute with TM Computer Consulting does not affect your ability to obtain support services with us; you are welcome to call us with any support issue you have regarding Pharmacist's Companion.

As a vendor vital to your business, we understand that this may be disconcerting and confusing.  We find it to be the same. Yet, we will not give up.  We fully intend to provide you with the best consulting software available, and hopefully the best service you have received.  We do ask that you continue to work with us through this transition period.  We fully anticipate having a solution for you soon.  I would like to thank you in advance for your continued loyalty and continued business; we believe your faith and confidence will be rewarded.

Please watch the website, www.apothacarellc.com for updates and new information as this matter progresses. We will do our best to keep you informed of changes coming.

After plaintiff notified defendant of its intention to seek a TRO, defendants sent an email and mail to over 400 recipients directing them to www.apothacarellc.com to read the letter.  After plaintiff filed the motion for a TRO, defendants posted a link to an

8 - ORDER

updated license key for Pharmacist's Companion which allows customers whose license are expiring to extend their license to the Pharmacist's Companion Software without renewing through plaintiff.

Plaintiff maintains that defendants are soliciting customers for support services beyond those allowed for upon termination of the agreement and infringing plaintiff's trademarks. Plaintiff also contends that the open letter contains false and disparaging information about plaintiff.

Plaintiff argues it is entitled to a preliminary injunction on its unfair competition and trademark claims, cybersquatting claim, and trade libel disparagement claim.

When trademark and unfair competition claims are based on the same infringing conduct, the analysis for both claims is the same. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1288 n. 2 (9th Cir. 1992). To succeed on a claim for trademark infringement or unfair competition, plaintiff must establish:

> (1) ownership of the trademark at issue;
>
> (2) use by defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or advertising of goods or services; and
>
> (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive.

Toho Co., Ltd. v. William Morrow and Co., Inc., 33 F.Supp.2d 1206, 1210 (C.D.Cal. 1998). Relevant, but non-exclusive factors to consider with respect to the confusion element include: 1. strength

of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines. AMF v. Sleekcraft Boats 599 F.2d 341, 348-49 (9th cir. 1979) abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792 (9th Cir. 2003). Some factors may have more importance than others, and the relative importance of each factor will be case-specific. Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1054 (9th Cir. 1999).

Defendants do not specifically address the likelihood of success on the merits.[2]

There appears to be no dispute that plaintiff owns the marks APOTHACARE, APOTHLINE, PHARMACIST'S COMPANION, and a form of the mortar and pestle design through plaintiff's long and continuous use of the marks and substantial advertising and sales of its products under the marks.

Through the licensing agreement, defendants were granted limited use plaintiff's intellectual property and marks for the term of the

---

[2]As noted above, defendants prefer the requirements for a permanent injunction (where the merits have already been decided) and focus on the issue of irreparable harm and essentially argue this case is really about money and that legal damages will suffice negating the need for injunctive relieve.

agreement.    Those  rights  extend  beyond  the  expiration  of  the
agreement only as to

> Authorized  End-User  Copies  **that  have  been  completed,**
> **marketed, and installed** pursuant to the VAR license **prior**
> **to the effective date of termination.** (emphasis added)

At  this  point,  it  is  not  clear  whether  defendant  may  use
Apothacare  in  its  domain  names  to  continue  to  provide  support  to
these  end-users,  but  it  does  appear  that  such  support  will  be  of  a
limited  duration  given  that  a  new  version  of  the  software  is  imminent
and  even  these  users  would  likely  want  to  upgrade.    Despite
Defendants' assertions, the agreement is clear that only those copies
that  have  actually  been  sold  and  installed  can  continue  to  be
supported  by  defendants  and  thus  once  a  new  version  comes  out,
defendant  can  not  sell  and  provide  support  even  to  pre-existing
customers  or  ever  renew  licenses  to  already  installed  copies  of  the
software once expired.[3]  Moreover, the VAR license makes clear that
plaintiff  owns  the  Apothacare  marks  because  each  license  explicitly
states  as  much.    Accordingly,  at  a  minimum,  by  posting  an  updated
license  key  on  its  website,  defendant  is  engaged  in  unauthorized  use
of  the  Apothacare  mark  and  the  Pharmacist's  Companion  mark.    In
addition,  defendants  engaged  in  unauthorized  use  of  the   mark
Apothline   in   connection   with   its   user   support   at
www.apothacarellc.com for a period of time.  Defendant continues to

---

[3]Because  at  that  point  the  end-user  is  no  longer  "authorised."

use the mortar and pestle design, but it is different than plaintiff's design.

Defendants maintain that the use of the Apothacare trademarks is lawfully based on plaintiff's consent and acquiescence. However, the agreement only provided consent for the use of the marks for a limited time frame. Even though plaintiff allowed defendant to use the name Apothacare, LLC as a corporate name, this does not evidence an intent to let defendants continue to use the marks beyond already authorised end-users with already installed copies of Pharmacist's Companion and in fact the licenses executed with each individual user specifically indicate otherwise. Each license indicated that plaintiff is the owner of the marks.

Defendant's use of the name Apothacare, LLC advanced plaintiff's interests during the term of the agreement, but does not indicate that plaintiff consented to use of the name beyond the agreement and the fact that the agreement had an expiration and that each every license indicates that plaintiff owns the marks is contrary to consent. Indeed, immediately upon expiration of the agreement, plaintiff notified defendant to cease using the marks.

Defendants also argue that the agreement authorized and directs defendants to add code to the software, support the website, and create a manual. However, the agreement does provide that all code and documentation including any enhancements shall be marked with plaintiff's copyright except derivative works and documentation

prepared by defendants.  Of course the issue in this case is trademarks and not copyrights.  There is no joint work doctrine in trademark law.[4]  Simply because defendants used the name Apothacare, LLC. there is no implication that plaintiff consented to or is estopped from asserting trademark infringement.

Defendants also assert that plaintiff informed defendant Reed before he formed Apothacare, LLC that one of its main competitors is Apothecare-MTM (spelled Apoth**e**care) and that apparently plaintiff did not take action to protect its trademark against this company.  This is an issue better discussed with respect to the confusion and the strength of the mark not under whether the use of the mark was authorized element.

Plaintiff asserts that defendants use of the marks is likely to cause confusion.  As noted above, relevant, but non-exclusive factors to consider with respect to the confusion element include: 1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the

---

[4]Defendants do contend that the termination portion of the agreement does not require cessation of "products" developed as derivative works by defendants. However, the agreement defines product as computer programs that contain or are derivative works that are completed in marketable form (with appropriate documentation) by the VAR. Agreement at ¶ 1.10. The termination portion of the agreement states that VAR shall cease all use of the code and documentation **and any derivative works thereof.** Agreement at ¶ 12.3 (emphasis added). Defendants do not support its consent or estoppel arguments at this time.

purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines.

A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; and will be afforded the widest ambit of protection from infringing uses. <u>See, e. g.,</u> <u>National Lead Co. v. Wolfe</u>, 223 F.2d 195, 199 (9th Cir. 1955) (Dutch Boy not used geographically or descriptively, but in a "fictitious, arbitrary and fanciful manner"). A descriptive mark tells something about the product; it will be protected only when secondary meaning is shown. <u>See</u> <u>Miss Universe, Inc. v. Patricelli</u>, 408 F.2d 506 (2d Cir 1969); <u>Cf.</u> <u>Hesmer Foods, Inc. v. Campbell Soup Co.</u>, 346 F.2d 356 (7th Cir. 1965) (barbecue beans used as a description, not a trademark). In between lie suggestive marks which subtly connote something about the products. Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning. <u>Watkins Products, Inc. v. Sunway Fruit Products, Inc.</u>, 311 F.2d 496 (7th Cir. 1962).

Although the distinction between descriptive and suggestive marks may be inarticulable, several criteria offer guidance. The primary criterion is "the imaginativeness involved in the suggestion," Restatement of Torts s 721, Comment a (1938): that is, how immediate and direct is the thought process from the mark to the particular product. Here, Apothecary means pharmacist. The mortar and pestle is commonly descriptive of pharmacy related business.

Slight changes to these terms and symbols do little to go beyond generic and descriptive. The mark does not appear to be entitled to strong protection, but when used in concert with software, although software designed for use in the pharmacy industry, it does become somewhat more distinctive. Still this factor weighs in defendants' favor.

The proximity of the goods obviously favors plaintiffs here as they are the same. The marks are very similar, although there is an easily distinguishable difference in the mortar and pestle design.

Both parties provide evidence of actual confusion (defendant's open letter appears to concede this point) and thus this factor weighs in plaintiff's favor.

Both parties use the same marketing channels and this factor strongly favors plaintiff as the website names are extremely similar.

The degree of care likely to be exercised by the customers favors plaintiff because defendants previously were authorized to sell the product to new customers and appears to be a valid source of the product. Defendants knew that plaintiff owned the mark and despite claims of confusion over the meaning of previous customers, the agreement is clear that defendants may only continue to serve end-users whose authorized copy of the software was already installed. Defendants posting of an updated license even for previous customers, but now unauthorized customers, violates the agreement and the trademark. The use of a new website with a

substantially similar name also demonstrates bad faith especially when viewed in light of registering the domain name of apothacaresoftware.com in what can be construed as an attempt to portray itself as the authorized seller of the software to all potential users. It may not seem fair that after a year and a half, the agreement virtually ends defendants ability to sell to and service end-users of the software, but defendants knowingly entered into an agreement that limited them to already installed versions of the software upon termination.

Plaintiff is currently working on version 3 of the software and although defendant may have legitimately assumed that the new version would be delivered during the term of the agreement there was no explicit requirement for plaintiff to do so.[5]  No reasonable definition of the termination portion of the agreement allows defendants to sell and install version 3 to any customers.  If defendant continues to sign up customers prior to the release of version 3, confusion and ill-will is likely to result against plaintiff.  The expansion of the product line weighs in favor of confusion and this factor thus favors plaintiff.

It appears that plaintiff is likely to succeed on its unfair competition and trademark claims.  Plaintiff also contends it is likely to succeed on its cybersquatting claim and defendant does not

---

[5]The agreement did provide at ¶ 9.2 that it was understood that plaintiff would provide enhancements for pharmacist's companion version 3, but it did not provide a date.

specifically address it.   To prevail plaintiff must show that defendants have, with bad faith, intended to profit from plaintiff's mark and registered or trafficked in a domain name that is identical or confusingly similar to the distinctive mark.   15 U.S.C. § 1125(d). The domain names apothacarellc.com and apothacaresoftware.com are similar to the trademark apothacare.   There is an inference that defendants had a bad faith intent to profit from use the name. However, as noted above, although spelled different than apothecary, the mark is not all that distinct.   But its use in software related to pharmaceuticals is somewhat more distinct.   The likelihood of success is little murkier with this claim.

Plaintiff also contends that it is likely to succeed on its trade libel/disparagement claim.   To establish a claim of defamation, plaintiff must show that defendants communicated a defamatory statement about the plaintiff to a third party.   <u>Wallulis v. Dymowski</u>, 323 Or. 337, 342-43 (1996).   If the statement derogated plaintiff's business, trade or profession, plaintiff is not required to establish that the publication of the statement caused economic damage.   <u>Hinkle v. Alexander</u>, 244 Or. 267, 273 (1966). In such cases, the defamation is referred to as defamation " per se." <u>Id</u>.

Plaintiff asserts that the open letter defamed it in that it asserted as fact that plaintiff was required to deliver an updated version of Pharmacist's companion and that plaintiff "canceled" the

contract after failing to provide the update. The contract specifically states that

> It is understood and agreed that [plaintiff] will provide enhancements for pharmacist's companion version 3 and thereafter an update for Med Count functionality, the Personal Recommendations module, and multiple report generation capability.

Marketing License Agreement at ¶ 9.2.

Defendants contend that the open letter merely contains pure opinion and thus is not actionable defamation. While the letter is much closer to a statement of fact than opinion, the court is not prepared to find a strong likelihood of success at this time. One could argue that there was an implicit expectation for plaintiff to deliver version three.


Irreparable Harm

Once plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted. Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n. 3 (9th Cir. 1989).[6]

Moreover, even defendants materials demonstrate that there is confusion and that in fact the open letter was an attempt to dispel

---

[6]Defendant cites ebay Inc. v. MercExchange, LLC., 547 U.S. 388, 392 (2006) for the proposition that the Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed. However, that was in the context of determining whether to issue a permanent injunction in a patent case. At this stage, because only the possibility of irreparable harm is required, the Ninth Circuit case appears to control.

that confusion.  Thus, plaintiff has shown irreparable harm.  This is
more than a simple breach of contract.  It is true that the monetary
damages for each stolen customer could be easily calculated, but the
loss of good will that can result from the confusion that will likely
befall these customers and the possible belief that the inability to
get an updated version from an apparent legitimate vendor can not be
so easily calculated.


Balance of Hardships

        The hardship that defendant asserts will fall upon them if the
injunction is granted relate to an interpretation of the contract
that does not limit post-termination rights to end-users whose
authorized copies of the software have already been installed.  it
appears unlikely, at this stage, that a reasonable interpretation of
the agreement could result in a definition of such users that include
providing more copies, new licences etc.  Authorized means licensed
and already installed copy means licensed copies installed on a
specific computer as of the date of termination.  There may be leeway
as to what support can be provided and what documentation can be
provided, but an appropriate injunction can be fashioned to account
for those preexisting customers.[7]

_____

        [7]For  instance,  the  injunction  could  provide  that  a  computer
crash  that  results  in  corruption  of  already  installed  software  may
be  replaced  with  the  version  in  existence  as  of  the  date  of  the
termination  of  the  contract.    But  the  only  reasonable
interpretation  of  the  contract  requires  support  to  be  cut  off  at
that point, i.e., version 2.6.17 and Patch M only.

19 - ORDER

Defendant also appears to be arguing unclean hands, without so stating, in that it argues that plaintiff is interfering with its contract rights by contacting clients and making disparaging remarks. However, plaintiff is not prohibited from contacting new clients for the software or clients for updated versions.

Defendants claim that granting the injunction will put them out of business. But, the contract grants defendants the ability to sell licensed software for only a limited period of time and to provide support to which ever version existed at the point of termination. Defendants also argue they have rights with respect to enhancements they made, but again the contract provides royalties with respect to the software it sold. If defendant is still providing enhancements, it is doing so without the authority to use the plaintiff's marks.

A grant of a preliminary injunction only will prevent defendants from doing what they are not authorized to do.


Public Interest

Granting a preliminary injunction in this case will benefit the public in that it will not suffer confusion regarding Pharmacist's Companion. Moreover, potential customers will be protected from unauthorized copies of the software and an inability to upgrade without starting over.

Scope of Relief

Plaintiff's requested injunctive relief goes well beyond what is necessary to preserve the status quo and its somewhat weak marks. At this stage of the proceedings, the court is not willing to force defendant to give up the apothacarellc.com domain. Moreover, the court is not willing to dictate from which customers defendant can not accept payment, so long as it is made clear in defendants' continuing service of authorized end-users that it may not provide service beyond version 2.6.17 and Patch M only to customer copies installed prior to June 30, 2008. To that end, defendant shall be required to post in a conspicuous manner on the main page of its website at www.apothacarellc.com that:

> Apothacare, LLC is no longer associated with TM Computer Consulting and its Apothacare line of software. As of June 30, 2008, Apothacare, LLC is no longer authorized to supply or support end-users of Pharmacist's Companion who did not have a licensed copy of Pharmacist's Companion installed on any given computer as of that date. Authorized users with copies of the software as of that date should still continue to utilize Apothacare, LLC, for support up to and including version 2.6.17 and Patch M of Pharmacist's Companion and in the event the authorized software becomes corrupted or otherwise unusable on any computer licensed to use the software, Apothacare, LLC will provide support in correcting or reinstalling the software. All other users/potential users of Pharmacists's Companion are directed to TM Computer Consulting which operates at www.apothacare.com as Apothacare.

Defendants shall also refrain from operating a website under the domain name www.apothacaresoftware.com. Defendants shall remove the link providing unprotected access to a license key for Pharmacist's Companion. Other than continuing to operate as Apothacare, LLC as

limited above, defendants shall refrain from using the Apothacare mark in any manner and shall refrain from soliciting/servicing clients for Pharmacists' Companion beyond those identified above. To the extent defendants are contacted by any customers for Pharmacist's Companion in a manner different than through the website apothacarellc.com, they shall provide the notice required above. Defendants are also enjoined from disclosing any of plaintiff's confidential and proprietary information and trade secrets related to Pharmacist's Companion.

Bond

Plaintiff shall post a bond, within 10 days, in the amount of $100,000 to protect the interests of defendants.

CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction (#4) is granted to the extent noted above.

DATED this __11th__ day of September, 2008.

                    __s/ Michael R. Hogan__
                    United States District Judge